UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| In re: ) | |
| ) | |
|     DAVID J. LUCASH ) | Case No. 07-10729-SSM |
| ) | Chapter 13 |
|                 Debtor ) | |
| ) | |
| CROSSPOINTE TRUSTEES, LLC ) | |
| ) | |
|                 Movant ) | |
| ) | |
| vs. ) | |
| ) | |
| DAVID J. LUCASH *et al*. ) | |
| ) | |
|                 Respondents ) | |

**MEMORANDUM OPINION**

A hearing was held on June 20, 2007, on the motion of Crosspointe Trustees, LLC, for relief from the automatic stay in order to obtain possession of real property located at 9566 James Madison Highway, Warrenton, Virginia, and for a determination that the lease under which the debtor occupies the property has been rejected and is not property of the estate. Until shortly before this chapter 13 case was filed, the debtor was the record owner of the property. Then—in furtherance of what was presented to him as a foreclosure prevention program under which $23,700 was advanced to stop an impending foreclosure sale of a different property—he executed a series of instruments that had the effect of transferring legal title to his residence to a land trust of which Crosspointe is the trustee, with the debtor becoming merely a tenant. The debtor asserts that he had no idea he was

1

transferring ownership of the property, which all the parties agree had at least $500,000 in equity. The court, after hearing the evidence, ruled from the bench that Crosspointe was sufficiently protected in the short term by the substantial equity cushion and by the debtor's offer of a $4,079 adequate protection payment. The court therefore declined to terminate the automatic stay and set a further hearing to resolve adequate protection issues on a going-forward basis. An order reflecting that ruling was entered on June 21, 2007. The purpose of this opinion is to explain more fully, for the benefit of the parties and any reviewing court, the reasons for the ruling and also to address the lease rejection issue.

<u>Background</u>

The debtor, David J. Lucash, is a 45-year-old college graduate who owns and operates two small businesses. He filed a voluntary petition in this court on March 28, 2007, for adjustment of his debts under chapter 13 of the Bankruptcy Code. Among the assets listed on his schedules were two parcels of real estate: a rental property located at 2100 Painter Lane, Haymarket, Virginia, and his own residence located at 9566 James Madison Highway, Warrenton, Virginia. The rental property had been scheduled for a foreclosure sale at 8:00 a.m. on March 6, 2007. Although it did not have a great deal of equity, Mr. Lucash—who had been trying to sell the property for a year and a half—did not want to have a foreclosure on his credit report. Sometime prior to the scheduled sale, he had received a letter from an entity called Sovereign Capital Development Authority, LP ("Sovereign Capital") promoting that company's foreclosure prevention program. On March 3, 2007, the debtor telephoned the number provided and spoke briefly with Larry Starks, a vice president of Crosspointe (and evidently also an officer of Sovereign Capital).

On the afternoon of March 5, 2007, Starks and another representative of Sovereign Capital, Christopher Maher, met with the debtor at his house. The testimony is sharply conflicting as to what Starks and Maher told the debtor concerning the foreclosure prevention program and the effect of the documents he was being asked to sign. In any event, shortly before 5:00 p.m., the debtor, Starks, and Maher went to a nearby bank that had a notary public, and the debtor signed a series of documents, comprising approximately 44 pages, that, among other things, (1) created a land trust, of which the debtor was the grantor, initial trustee, and initial beneficiary; (2) deeded the debtor's residence to the land trust; (3) appointed Crosspointe as the successor trustee of the land trust; (4) assigned the beneficial interest in the land trust to Sovereign Capital; and (5) leased the property back to the debtor for two years beginning April 1, 2007, at a monthly rent of $2,717.03.

As explained in still another document entitled "Foreclosure Prevention Agreement," the rent was calculated as the sum of the regular monthly mortgage payment on the property ($2,260.78) plus interest at 15% per annum on a principal amount composed of the sum paid to stop the foreclosure plus $12,500 in "administrative" and trustee fees. The agreement further provided that if the principal amount were repaid within two years and the rent payments were not in default, the beneficial interest in the property would be reassigned to the debtor. If the debtor were unable to maintain the payments or did not redeem the property by the end of the two years, Crosspointe would be entitled to sell the property, with the debtor receiving a specified share of the proceeds provided he had voluntarily vacated the property; otherwise he would receive nothing. The debtor's testimony is that he did not read the documents and assumed that he was simply placing a junior deed of trust against the

property. It is undisputed that he was not given copies that evening of any of the documents he signed. The next morning, Maher appeared at the foreclosure sale and tendered a cashier's check to the substitute trustee in the amount of $25,000 to reinstate the mortgage. The substitute trustee—who had not been able to provide a precise reinstatement figure in advance of the sale—subsequently refunded approximately $1,300.00, for a net advance of approximately $23,700.00.

The debtor testified that copies of the documents he had signed were not mailed to him until several weeks later. The parties agree that the residence—because it is situated on land that is zoned commercial—is worth approximately $850,000. There is a first deed of trust against the property in favor of IndyMac Bank in the amount of approximately $300,000. Shortly after the Foreclosure Prevention Agreement and related documents were signed, Crosspointe discovered that the deed of trust on the debtor's residence was also facing foreclosure. Crosspointe then advanced an additional $12,763.69 to bring that deed of trust current and thereafter executed and recorded a deed of trust (referred to in the Foreclosure Prevention Agreement as a "redemptive deed of trust") against the property to secure the fees charged and the funds that had been advanced. Stark testified that the additional money advanced would increase the monthly rent payment under the lease by one-twelfth of 15% of $12,763.69, or $159.56. Although the deed of trust was not offered in evidence, the noteholder and beneficiary is evidently an entity called Dominion Equity Investments Group ("Dominion Equity").[1]

---

[1] The testimony at the hearing was vague as to the amount secured by the deed of trust. As nearly as the court can determine, the amount would have been approximately $48,963.69,
(continued...)

The debtor listed Dominion Equity on his schedules as the holder of a disputed secured claim against the residence, but did not provide for any payment on its claim in the plan that was filed on April 17, 2007.[2] That plan, which was confirmed without objection on May 15, 2007, requires the debtor to pay the chapter 13 trustee $549.00 per month for seven months plus a lump sum payment of $29,000.00 in month 3 and a $25,000.00 lump sum payment in month 7, for total plan funding of $57,843.00. The two lump sum payments are to come from a sale of the rental property and of a vacant lot, and the projected dividend on unsecured claims is 100 cents on the dollar. Shortly after the plan was confirmed, the rental property was sold, with net proceeds of approximately $11,000.00 being paid to the chapter 13 trustee. The vacant lot has not yet been sold.

It is undisputed that the debtor has not made any of the rent payments required by the lease. At the hearing, the debtor offered to make immediate payment of $4,078.97. It was not clear from the testimony what payments the debtor had made on the IndyMac deed of trust since the case was filed, but from statements made by his counsel it would appear that the April and May 2007 payments have been made, but not the June 2007 payment. Assuming that to be the case, the amount offered by the debtor would approximate the

---

[1](...continued)
consisting of the $23,700.00 to cure the default on the rental property, the $12,763.69 to cure the default on the residence, and the $12,500.00 in fees.

[2] The plan did, however, <u>address</u> the claim. Specifically, the plan stated, "The debt listed to Dominion Equity Investments was incurred through fraud . . . [and] is excluded from the Chapter 13 plan. Debtor will file an action/adversary proceeding to set aside the related transfer, as soon as the Chapter 13 Trustee gives permission for the Debtor to proceed." Plan § 11, p. 5. Neither Dominion Equity nor Crosspointe has filed a proof of claim in the case.

missing mortgage payment plus three months of interest at 15% per annum on the approximately $36,423.00 that had been advanced to bring the two mortgages current.

## Discussion

### I.

The filing of a bankruptcy petition creates an automatic stay of most types of creditor acts against the debtor, property of the debtor, and property of the bankruptcy estate. § 362(a), Bankruptcy Code. On motion of the party who is stayed, however, the automatic stay may be annulled, terminated, modified, or conditioned for "cause," including lack of adequate protection. § 362(d)(1), Bankruptcy Code. The Bankruptcy Code does not define "cause," and the Fourth Circuit has explained that the court must "balance potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if relief is denied." *Robbins v. Robbins (In re Robbins)*, 964 F.2d 342, 345 (4th Cir. 1992).

The debtor's position is that his signature on the documents that conveyed his residence into a land trust controlled by Crosspointe was obtained by fraud, and he represents that he has located an attorney who is willing to represent him in a state court action to rescind the transaction. Clearly, the success of such an action will depend on the debtor's credibility as a witness vis-a-vis that of Stark and Meher. But even if the debtor's testimony is accepted, his legal position is weakened by the fact that in his testimony he could not identify any affirmative misrepresentation, and by his further testimony that he did not read any of the documents he signed on March 5, 2007. Be that as it may, in some instances fraud may be committed by artful silence as well as by an affirmative

misrepresentation. But, even if a court did not find fraud, it might conclude that the elaborate structure of the transaction was an improper attempt to evade the limits on interest under Virginia's usury laws. *See Wilson v. Moir (In re Wilson)*, 359 B.R. 123, 139 (Bankr. E.D. Va. 2006) (equitably subordinating claim for $250,000 "kicker" where transaction was structured as "investment" rather than loan in apparent effort to evade usury restrictions).

In any event, at this juncture the court need not make a finding as to the debtor's likelihood of ultimate success. Suffice it to say that the circumstances under which the debtor's signature was obtained (including the failure to provide him with copies of what he had signed until much later) raise enough questions as to make the transaction the fair object of further inquiry. In the meantime, Crosspointe's interest in repayment of the funds advanced is fully protected by the very substantial equity cushion that exists in this case. As noted, Crosspointe concedes that the property is worth at least $850,000. The only liens senior to its interest are unpaid real estate taxes (which apparently do not exceed $4,000) and a $300,000 deed of trust. In economic terms, therefore, Crosspointe is in the same position as a lender that had made a 42% loan-to-value ratio loan against the property. Accordingly, even if Crosspointe received no payments in the short term, its right to ultimate payment of all sums due would not be impaired. Of course, without current payments being made on the first deed of trust, Crosspointe's interest could potentially be wiped out by a foreclosure; hence, adequate protection of Crosspointe's interest would at the very least require that payments on the first deed of trust be kept current. The debtor, however, has agreed to do so and has also expressed a willingness to make some additional form of payment on a going-forward basis. In short, there is little if any prejudice to Crosspointe from

continuation of the automatic stay, and what minimal prejudice there may be is far outweighed by the prejudice to the debtor, who stands to be evicted from his residence and lose over $450,000 of equity if the automatic stay is terminated. For that reason, the court declined to terminate the automatic stay and set a further hearing to resolve adequate protection issues. Additionally, because ultimate resolution of the underlying dispute should not linger, the court made continuation of the stay contingent upon the debtor promptly bringing a state court action to rescind or reform the transaction, or modifying the plan to provide for the claim, or both.[3]

II.

An issue the court did not address in its bench ruling was Crosspointe's argument that relief from the automatic stay was appropriate because the Rental Agreement, not having been assumed in the plan, is deemed rejected and is thus no longer property of the bankruptcy estate. The general statutory framework is straight-forward. In a bankruptcy case, the trustee may assume (that is, elect to perform) or reject (that is, elect to breach) the debtor's obligations under an unexpired lease. § 365(a), Bankruptcy Code. Assumption is permitted even if the lease is in default, provided that the default is cured (or assurance given of a prompt cure), the landlord is compensated for any loss resulting from the breach,

---

[3] The plan confusingly conditions the bringing of the rescission action on "permission" from the chapter 13 trustee. No permission is required for a chapter 13 debtor to bring suit on his or her own causes of action, since a chapter 13 debtor has, "exclusive of the trustee," the right to "use" property of the estate, which for a cause of action necessarily includes bringing suit on it. § 363(b) and § 1303, Bankruptcy Code. What a chapter 13 debtor does lack is the trustee's ability to bring actions based on the specific avoidance powers granted to trustees by §§ 544 through 550, Bankruptcy Code. However, so long as the claims made by the debtor do not invoke one of the trustee's avoidance powers, the trustee's approval is not required.

8

and adequate assurance is given of future performance. § 365(b)(1), Bankruptcy Code. Rejection constitutes a breach of the lease and gives rise to a claim for damages, which, however, is treated as a prepetition claim. § 365(g), Bankruptcy Code. In a chapter 13 case, an unexpired lease of residential property may be assumed or rejected by the trustee at any time prior to confirmation of a plan, § 365(d)(2), Bankruptcy Code, or by the debtor in the plan itself. § 1322(b)(7), Bankruptcy Code.[4]

In most instances, the debtor's failure in a chapter 13 plan to assume an unexpired residential lease would constitute cause for termination of the automatic stay, at least if the lease were in default.[5] But that assumes the contract is a true lease. The Rental Agreement at issue in this case cannot be viewed in isolation for the simple reason that it was not executed in isolation but as part of a larger integrated transaction, the economic effect of which was to mortgage the debtor's residence to secure repayment of the funds that had been advanced to forestall foreclosure of the rental property and the residence. Because the

---

[4] Crosspointe's motion cites to § 365(d)(1), Bankruptcy Code, for the proposition that the lease is deemed rejected. That subsection, however, applies only to chapter 7 cases. It is noteworthy that § 365(d)(2), which is applicable to chapter 13 cases, does not contain the "deemed rejected" language of the chapter 7 provision. There is authority for the proposition that if an executory contract is neither assumed nor rejected, it will ride through a bankruptcy reorganization. *Century Indem. Co. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 504 n.4 (5th Cir. 2000); *see also, Consolidated Gas Elec. Light & Power Co. of Baltimore v. United Railways & Elec. Co. of Baltimore*, 85 F.2d 799, 805 (4th Cir. 1936) ("An executory contract, therefore remains in force in a [corporate reorganization] proceeding . . . until it is rejected, and unless rejected, it passes with other property of the debtor to the reorganized corporation.") (decided under Bankruptcy Act of 1898).

[5] As this court has previously noted, rejection, although it constitutes a breach of the lease, does not terminate the lease. *Federal Realty Investment Trust v. Park (In re Park)*, 275 B.R. 253, 255-56 (Bankr. E.D. Va. 2002). Moreover, if the debtor is otherwise current on all obligations as tenant, a merely technical breach arising from rejection does not constitute a material default that allows the landlord to terminate the tenancy. *Id*. at 256-57.

Rental Agreement cannot be viewed as a true lease but rather (when read with the other documents) as the economic equivalent of a mortgage, it is properly analyzed under the Bankruptcy Code provisions related to secured claims. Of course, since it is a claim secured by the debtor's principal residence, and since the final payment is due before the final payment under the plan, the claim (unless the debtor is successful in his action to rescind the transaction) would have to be paid in full within the plan term. § 1322(c)(2), Bankruptcy Code.

The confirmed plan in this case does not provide for payment of Crosspointe's claim but simply gives notice that the debtor intends to bring a separate action attacking it. A claim that is not provided for by a chapter 13 plan is not discharged at the conclusion of the case. § 1328(a), Bankruptcy Code. But simply because a claim will not be discharged at the conclusion of the case does not <u>require</u> that the creditor be granted relief from the automatic stay, although it may constitute a good reason for doing so, particularly when enforcement of the claim will not prejudice other creditors. On the other hand, a creditor who has been given notice of a chapter 13 plan but fails to object to confirmation is normally not entitled to relief from the automatic stay on the ground that the plan does not provide adequate protection of its claim. *Chevy Chase Bank v. Locke*, 227 B.R. 68 (E.D. Va. 1998). In this case, the beneficiary of the land trust, Dominion Equity, was given notice of the plan (as was Sovereign Capital) but did not object to confirmation. Under the circumstances, the court cannot find that relief from the automatic stay is compelled simply because the confirmed plan fails to pay the claim. Nevertheless, the debtor may well wish, in light of the court's

discussion, to consider whether the plan should amended to provide for payment of the claim.

A separate order has previously been entered conditionally denying relief from the automatic stay and setting a further hearing on adequate protection.

Date: _____        _____
                                    Stephen S. Mitchell
Alexandria, Virginia                United States Bankruptcy Judge

Copies to:

Gregory M. Wade, Esquire
616 North Washington Street
Alexandria, VA 22314
Counsel for the movant

John D. Sawyer, Esquire
Sawyer & Azarcon
10605 Judicial Drive, B-2
Fairfax, VA 22030
Counsel for the debtor

David J. Lucash
9566 James Madison Hwy
Warrenton, VA 20186
Debtor

Gerald M. O'Donnell, Esquire
211 North Union St., Suite 240
Alexandria, VA 22314
Chapter 13 trustee